```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X

MELANIE LIDLE, et al.,                 :

                Plaintiffs,            :      08 Civ. 1253 (BSJ)(HBP)

     -against-                         :

CIRRUS DESIGN CORPORATION,             :      ORDER
et al.,
                                       :
                Defendants.
                                       :
---------------------------------X
```

PITMAN, United States Magistrate Judge:

I.  Introduction

Defendants move to strike the supplemental or rebuttal report of plaintiffs' expert, Peter Leffe, and to deny plaintiffs leave to serve the report (Docket Item 49).  For the reasons set forth below, defendants' application is granted.

II.  Facts

This is a wrongful death action arising out of the deaths of former New York Yankees pitcher Cory Lidle and his flight instructor, Tyler Stanger.  On October 11, 2006, a Cirrus aircraft occupied by Lidle and Stanger had flown northbound up the East River in a corridor of uncontrolled airspace.  Approximately one mile north of the Queensboro Bridge, the aircraft attempted to execute a 180 degree turn to reverse its course and

to avoid the controlled airspace surrounding LaGuardia Airport. The aircraft did not complete the turn successfully and crashed into an apartment building on East 72nd Street on Manhattan's Upper East Side, killing Lidle and Stanger.

The aircraft was not equipped with a flight data recorder or cockpit voice recorder, and there were no radio transmissions from the aircraft immediately prior to the crash that might have shed light on its cause.  Thus, there is no direct evidence concerning the cause of the crash.  The principal dispute in this litigation is whether the crash was due to a piloting error by either Lidle or Stanger or to a malfunction of the aircraft's control system.

Both sides have retained experts in an attempt to find support for their theories in the wreckage of the aircraft, and these experts have repeatedly examined the wreckage.  Plaintiffs' experts claim that certain deformations (bends, gouges, scrapes, etc.) in parts of the control system, in conjunction with other evidence, demonstrate that the controls jammed and caused the aircraft to strike the building.  Not surprisingly, defendants' experts disagree with these conclusions, and claim that the damage to the parts was caused by the crash and discloses nothing concerning the cause of the crash.

On December 16, 2008, I entered a Scheduling Order in this matter directing that the parties make their initial expert

2

disclosures on December 24, 2008 and that rebuttal[1] expert re-
ports be served on January 21, 2009.  Three days later, I held a
tape-recorded conference call with counsel, during which plain-
tiffs' counsel asserted that they were entitled to reply to
defendants' rebuttal reports.  I rejected plaintiffs' contention
that they were entitled to reply to defendants' rebuttal reports
as a matter of right, and advised plaintiffs that they could make
an application to serve reply reports if defendants' rebuttal
reports raised new matters.

        Plaintiffs served their expert reports on December 24,
2009.  The reports were authored by an accident reconstruction
expert, a metallurgist, an aerodynamicist, an expert on piloting

---

[1]The word "rebuttal" is frequently used inconsistently.  In
a trial, the expression "rebuttal evidence," is usually used to
describe evidence offered by the plaintiff (or the prosecution in
a criminal case), to contradict new issues raised by the evidence
offered by the defendant.  See United States v. Tejada, 956 F.2d
1256, 1266-67 (2d Cir. 1992); Weiss v. Chrysler Motors Corp., 515
F.2d 449, 457-59 (2d Cir. 1975); Wing Shing Prods. (BVI) Co. v.
Sunbeam Prods., Inc., 06 Civ. 3522 (RJH), 2009 WL 3151195 at *8
(S.D.N.Y. Oct. 1, 2009).  At least in my experience, I have never
heard the expressions "rebuttal evidence" or "rebuttal case" to
refer to evidence offered by the defendant immediately after the
plaintiff's (or prosecution's) case.

    With respect to expert disclosures, it is frequently used to
refer to the second of two rounds of expert discovery.  See
Brooks v. Outboard Marine Corp., 234 F.3d 89, 91 (2d Cir. 2000);
Lamoureaux v. Anazaohealth Corp., No. 3:03cv01382 (WIG), 2009 WL
1162875 at *2 (D. Conn. Apr. 30, 2009).

    To avoid any ambiguity, I shall refer to the expert report
in issue here, which seeks to respond to defendants' report, as a
"reply" report.

aircraft and an engineering expert.[2]  The defendants' initial disclosures were limited to the subject of pilot error.

The initial disclosures made on behalf of three of plaintiff's experts -- A.D. Llorente (an accident reconstruction expert), Dr. Arun Kumar (a metallurgist) and Peter Leffe (an engineering expert) -- are relevant to the present dispute. Llorente opined that the crash was the result of a progressive failure of the flight control system and based his report on the following physical evidence:  (1) scrape marks on the trailing edge of the spar at the trim cartridge/aileron actuator pulley; (2) the deformation in and marks on the roll trim cartridge rod; (3) a bend in the aileron attach bracket; (4) a bend in a pulley bracket; (5) marks in the left and right bearing blocks and (6) torsional bending of the control yokes.

Dr. Kumar also concluded that the flight controls had jammed and cited the following physical evidence in support of his conclusions:  (1) a bend in the aileron trim cartridge rod; (2) rotational gouges on a spar, and (3) marks on the left and right bearing blocks.

Finally, Peter Leffe, an engineering expert whose reply report is at issue on this motion, also concluded that the crash

---

[2]Plaintiff also made disclosures with respect to a sixth expert but subsequently withdrew the report and stipulated that its author would not be called at trial.

was caused by a progressive failure of the control system.  The
material portion of his report provides, in its entirety:

> It is my opinion that the subject accident involving
> N929CD was caused by the jamming of the rudder/aileron
> interconnect and the lockup of the aileron trim car-
> tridge.
>
> This is based upon the physical evidence, Service
> Bulletin SB 2X-27-14, R1, R2, R3, the Airworthiness
> Directive and the testimony of witnesses.
>
> It is my opinion that the Cirrus SR 20 need not be
> fully cross controlled to cause a lock up the aile-
> ron/rudder control system.
>
> This is based on the testimony of Bridgette
> Dormire, emails authored by Bruce Borden and photo-
> graphs taken of the other Cirrus Aircraft evidencing
> lockup.
>
> It is my opinion that the Cirrus SR 20 rudder/aileron
> interconnect system was hastily and poorly designed;
> that inadequate fail safe testing was done.
>
> This is based upon the testimony of Patrick
> Waddick and documents contained in his deposition;
> Service Bulletin SB 2X-27-14, R1, R2, R3, the Airwor-
> thiness Directive.
>
> It is my opinion that the Cirrus SR 20 rudder/aileron
> interconnect system was designed as a quick fix of a
> lateral stability problem with the aircraft and to
> comply with Part 23.177 was incorporated.
>
> This is based upon the testimony of Patrick
> Waddick and documents contained in his deposition;
> Service Bulletin SB 2X-27-14, R1, R2, R3, the Airwor-
> thiness Directive.
>
> It is my opinion that the Cirrus SR 20 interconnect
> system provided a way for Cirrus to demonstrate the
> required lateral stability but that the system will not
> meet the intended purpose of Part 23.177 and is a sham
> system which is below the conduct of care of an air-
> craft manufacturer.

5

        This is based on FAR Part 23, Cirrus Draft Posi-
tion Paper bates 18129-18132, Testimony of Waddick,
Diagrams of Flight Control System produced by Cirrus.

It is my opinion that the Lidle accident aircraft
experienced a lockup of the rudder/aileron interconnect
system.  That said lockup started a sequence of events
that caused the plane to enter an uncontrolled rolling
flight regime and fatally crash.

        This is based on the physical evidence, Service
Bulletin SB 2X-27-14, R1, R2, R3, the Airworthiness
Directive, the testimony of witnesses, radar data,
reconstruction of accident, Cirrus reconstruction of
aircraft attitude at time of impact and other documents
and information reviewed.

It is my opinion that the pilots were qualified and
capable of making the flight.  That the speed of the
aircraft would have allowed maneuvering in a confined
space.  That there was adequate airspace to allow the
aircraft to safely pass on either side or above the
building.

        The basis is my review of pilot qualifications,
pilots operating handbook, the NTSB Docket, my experi-
ence as a pilot and videos taken by Steve Lind.

It is my opinion that the physical evidence proves that
the aileron/rudder interconnect system was jammed.

        The basis is my examination of the wreckage in-
cluding components of the rudder aileron interconnect
system, witness testimony, the SB 2X-27-14, R1, R2, R3,
the Airworthiness Directive and various documents
produced by Cirrus.

It is my opinion that the aircraft impacted the build-
ing in an inverted attitude not consistent with con-
trolled flight of a non aerobatic aircraft.

        The physical evidence found in the wreckage, the
debris field and the reconstruction of the impact
attitude prepared by Cirrus Design Corporation.  [Sic.]

It is my opinion that a pilot[']s natural reaction to
an impending crash impact is to pull up and that the

6

physical evidence and radar evidence shows that the accident aircraft was in a steep descent.

The basis is eyewitness statements, radar data, my experience as a pilot and as an aviation accident investigator.

(Exhibit D to the Affirmation of Patrick E. Bradley, Esq., dated May 13, 2009 ("Bradley Aff.")).  In his deposition, which was conducted on January 30, 2009, Leffe confirmed that he did not perform any testing or analyses of the wreckage to confirm that his opinions were correct.  Instead, he testified that his physical inspection of the wreckage alone was sufficient to determine how and why the crash occurred (Bradley Aff. Ex. K at 119-23, 128-29, 185-86, 195).

Defendants served their rebuttal expert reports on or about February 23, 2009.  Two of defendants' reports addressed the inferences to be drawn from the aircraft's wreckage -- a report prepared by Engineering Systems Inc. ("ESI") and a second report authored by J.W. Morris, Jr., Sc.D.  The ESI report identified each of the conclusions reached by plaintiffs' experts and provided reasons why ESI believed plaintiffs' conclusions to be incorrect.  In addition to providing alternative explanations for the damage and deformations cited by plaintiffs' experts, the authors of the ESI report also performed a finite element analysis[3] to determine whether the control columns could have been

_____

[3] "Finite element analysis is a computer simulation
(continued...)

bent solely as a result of the control inputs of Lidle and Stanger.  ESI concluded that the control columns were not twisted by the pilots.  Apart from the finite element analysis, the ESI report was based entirely on an inspection of the wreckage; ESI performed no other testing or analyses.

Dr. Morris' report was limited to two issues:  (1) whether the location of a re-solidified mass of material that had melted in the post-crash fire indicated that the interconnect arm of the rudder-aileron interconnect was improperly positioned at the time of the accident, and (2) whether damage to the left aileron trim cartridge, its associated hardware and the support spar occurred before the crash and evidenced a lock-up of the controls.  Based on his inspection of the wreckage, Dr. Morris concluded that no inference concerning the cause of the crash could be drawn from the re-solidified mass of material and that the damage to the left aileron trim cartridge, its associated hardware and the support spar did not suggest a pre-crash lock-up of the controls.  Dr. Morris based his conclusions on his visual

----

[3](...continued)
technique used to model the real-world behavior of physical structures.  As with any mathematical analysis, the parameters applied to the mathematical model will affect the results." Advanced Magnetic Closures, Inc. v. Rome Fastener Corp., 98 Civ. 7766 (PAC), 2008 WL 2787981 at *11 n.15 (S.D.N.Y. July 17, 2008) (Crotty, D.J.); see also Cordis Corp. v. Medtronic Ave, Inc., 511 F.3d 1157, 1170 (Fed. Cir. 2008) ("Finite element analysis is a computer simulation technique used to model the real-world behavior of physical structures.").

inspection of the records and did not perform any tests to confirm his conclusions.

Although nothing in the schedule permitted it, plaintiffs served a "Supplemental Expert Report" of Peter Leffe on or about April 15, 2009 ("Leffe April 15 Report").  The substantive portion of the Leffe's April 15 Report was more than five times greater than his opening report (eleven pages of substantive material versus two pages in the opening report).  Leffe's April 15 Report not only repeated the conclusions in Leffe's original report, it also described tests that Leffe performed which purportedly confirmed his conclusions.  Specifically, Leffe described tests he performed with an exemplar aircraft that purported to confirm his opinions regarding the origins of "dimple" marks on the aileron stop blocks and the bending of the aileron attach brackets, the trim cartridge rods and the control columns.  Leffe also offered new reasons for his conclusions regarding the origins of arch shaped scoring marks on the spar and the significance of the re-solidified mass of molten material.

Plaintiffs do not explain why Leffe did all of his testing after defendants submitted their reports.

III.  <u>Analysis</u>

    A.  Leffe's April 15 Report
        Does Not Qualify
        <u>as a Reply Report</u>

       The Federal Rules of Civil Procedure and the Scheduling Order in this case contemplated only two rounds of expert reports, namely, opening reports addressing the issues on which the party submitting the report had the burden of proof and rebuttal reports that contradict or rebut the opening reports. Fed.R.Civ.P. 26(a)(2)(C); Order dated December 16, 2008 (Docket Item 16).  <u>See</u> <u>Akeva L.L.C. v. Mizuno Corp.</u>, 212 F.R.D. 306, 309-10 (M.D.N.C. 2002).  Nevertheless, consistent with the standard practice concerning reply or rebuttal evidence, I advised counsel that I would consider permitting reply reports if the second round of expert reports raised new matters.  "Rebuttal evidence is confined to new matters adduced by the defense and not to repetition of the plaintiff's theory of the case."  <u>Brune v. Time Warner Entertainment Co.</u>, 02 Civ. 5703 (KMW), 2004 WL 2884611 at *2 (S.D.N.Y. Dec. 14, 2004) (Wood, D.J.) (citation omitted); <u>Crowley v. Chait</u>, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) ("Rebuttal evidence is properly admissible when it will explain, repel, counteract or disprove the evidence of the adverse party.  It is not an opportunity for the correction of any oversights in the plaintiff's case in chief." (internal quotation marks and cita-

tions omitted)); <u>Ebbert v. Nassau Co.</u>, CV 05-5445 (FB)(AKT), 2008 WL 4443238 at *13-*14 (E.D.N.Y. Sept. 26, 2008) (striking rebuttal expert report containing material that should have been in initial report), <u>Akeeva L.L.C. v. Mizuno Corp.</u>, <u>supra</u>, 212 F.R.D. at 310 (rejecting expert rebuttal testimony, which included an entirely new test, because the testimony was not supplemental under Rule 26(e) and was not disclosed in accordance with court ordered discovery plan).

After carefully reviewing the parties' reports, I conclude that the Leffe April 15 Report is not an appropriate reply report.  Defendants' reports are limited to the same issues as plaintiffs' reports and, with one exception, are based on the same methodology, namely the visual inspection of the wreckage in light of the experts' specialized knowledge and experience.  For the most part, both sides' experts simply viewed the wreckage, made deductions based on the location and nature of the scrapes, bends and deformations and explained their reasons for reaching those deductions.  The one exception is the finite element analysis ESI performed concerning the twisting of the control columns.[4]  Although this aspect of defendants' reports utilized a

---

[4]In their Memorandum of Law in Opposition to Defendants' Motion to Strike the Supplemental/Rebuttal Report of Peter Leffe ("Plaintiffs' Mem.") (Docket Item 54), plaintiffs claim that defendants relied on mathematical modeling and computer modeling to analyze the dimple marks on the stop blocks and the deformation of the trim cartridge rod (Plaintiff's Mem. at 8).
(continued...)

new methodology, the methodology was used to address an issue
that was already raised in plaintiffs' reports.

Given defendants' reliance on this new methodology, the
door for a reply report was opened, but only with respect to the
finite element analysis itself.  Plaintiffs could, for example,
have submitted a report addressing the deficiencies of finite
element analyses in general or explaining why the finite element
analysis utilized by defendants' experts was defective.  The
Leffe April 15 Report does neither.  The Leffe April 15 Report
merely rehashes the conclusions reached in Leffe's opening
report, although the April 15 Report cites testing that purport-
edly supports the conclusion.  There is no reason that Leffe
could not have conducted those tests before his initial report
was drafted, and plaintiffs' gamesmanship in this regard is
precisely what the Rules were intended to prevent.  Fed.R.Civ.P.
26(a)(2)(B) ("The [expert's] report must contain:  (i) a complete
statement of all opinions the witness will express and the basis
and reasons for them; (ii) the data or other information consid-
ered by the witness in forming them . . . .").

Accordingly, the Leffe April 15 Report does not qualify
as a reply or rebuttal report.

---

[4](...continued)
No such modeling is described in the reports defendants served on
February 23, 2009.  If such modeling was discussed in the reports
defendants served in December 2008, plaintiffs should have
responded in the expert reports they served in February 2009.

B.  Leffe's April 15 Report
    Does Not Qualify
    <u>as a Supplemental Report</u>

Federal Rule of Civil Procedure 26(e) requires that disclosures made pursuant to Rule 26(a), which includes expert disclosures, be supplemented when the party who made the disclosure "learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . ." Rule 26(e) is not, however, a vehicle to permit a party to serve a deficient opening report and then remedy the deficiency through the expedient of a "supplemental" report.  As explained by the Honorable Theodore H. Katz, United States Magistrate Judge, in <u>Sandata Technologies, Inc. v. Infocrossing, Inc.</u>, 05 Civ. 9546 (LMM)(THK), 06 Civ. 1896 (LMM)(THK), 2007 WL 4157163 at *3-*4 (S.D.N.Y. Nov. 16, 2007):

> The purpose of the supplementation rule is to avoid ambush at trial and to assure that all material information has been disclosed.  By its express terms, the rule imposes a duty to supplement "information" that a party has already "provided" or "disclosed," either in response to a discovery request or in an expert report or deposition, when "the party learns that in some material respect the information disclosed is incomplete or incorrect."  Fed.R.Civ.P. 26(e)(1).

> The interest served by requiring the disclosure of expert opinions is self evident.  It is to prevent unfair surprise at trial and to permit the opposing party to prepare for the expert's cross-examination.  By "locking" the expert wit-

ness into what Fed.R.Civ.P. 26(a)(2)(B) calls "a
complete statement of all opinions to be expressed
and the basis and reasons therefor," the opposing
party knows exactly what she is facing and can
decide whether to take the deposition of the ex-
pert and to prepare for cross-examination and
rebuttal.  When the expert supplements her report
by addressing a new matter after discovery has
ended, the very purpose of the rule is nullified.

Coles v. Perry, 217 F.R.D. 1, at *4 (D.D.C. 2003).

It should be assumed that at the time an expert
issues his report, that report reflects his full knowl-
edge and complete opinions on the issues for which his
opinion has been sought.  See Fed.R.Civ.P. 26(a)(2)(B)
("The [expert] report shall contain a complete state-
ment of all opinions to be expressed and the basis and
reasons therefor.").  It is only if the expert subse-
quently learns of information that was previously
unknown or unavailable, that renders information previ-
ously provided in an initial report inaccurate or
misleading because it was incomplete, that the duty to
supplement arises.

Leffe's April 15 Report does not rely any information

that was previously unknown or unavailable to him.  Plaintiffs

control the wreckage; it has always been available to their

experts.  To the extent Leffe used an exemplar aircraft to

conduct the tests that underlie his April 15 Report, plaintiffs

make no claim that Leffe was unable to secure an exemplar air-

craft prior to the submission of his opening report.  In short,

plaintiffs cite no new information that would justify Leffe's

April 15 Report as a supplemental report.

14

C.  Application of the <u>Softel</u>
    Factors Does Not Justify
    <u>the Late Service of the Report</u>

Plaintiffs also argue that granting defendants' motion will result in Leffe being precluded from testifying and that preclusion is an overly harsh sanction in light of the factors identified in <u>Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.</u>, 118 F.3d 955 (2d Cir. 1997).

In <u>Softel</u>, plaintiff attempted to substitute a new expert for the expert it had originally retained.  The Magistrate Judge supervising discovery permitted the substitution but refused to extend the deadline for expert disclosures.  When the new expert was unable to serve his report in accordance with the deadline, the Magistrate Judge precluded the new expert from testifying, leaving plaintiff with no expert testimony.

After noting that the preclusion order was subject to an abuse-of-discretion standard, the Court of Appeals identified four factors as being relevant to determining whether the preclusion order constituted an abuse of discretion:

> (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

118 F.3d at 961.  Although <u>Softel</u> was decided in the context of an appeal from a preclusion order, it has also been applied by

15

district courts in assessing the propriety of a preclusion order. E.g., Eastwood v. City of New York, 05 Civ. 9483 (RJS), 2009 WL 3459206 at *3 (S.D.N.Y. Oct. 27, 2009) (Sullivan, D.J.); Scientific Components Corp. v. Sirenza Microdevices, Inc., 03 CV 1851 (NGG)(RML), 2008 WL 4911440 at *4 (E.D.N.Y. Nov. 13, 2008); Schiller v. City of New York, 04 Civ. 7922 (RJS)(JCF), 04 Civ. 7921 (RJS)(JCF), 2008 WL 4525341 at *3-*4 (S.D.N.Y. Oct. 9, 2008) (Francis, M.J.); Trouble v. Wet Seal, Inc., 179 F. Supp. 2d 291, 296-97 (S.D.N.Y. 2001) (Marrero, D.J.).

As an initial matter, plaintiffs substantially overstate the consequences of granting defendants' motion. Granting defendants' motion will not result in Leffe's preclusion nor will it deprive plaintiffs of expert testimony on the issue of causation. Leffe will merely be limited to the conclusions and reasons he expressed in his opening report. In addition, Leffe is not the only causation expert plaintiffs are offering. As noted above, plaintiffs have also served expert reports authored by A.D. Llorente and Dr. Arun Kumar in support of their theory that the crash was caused by the lock-up of the aircraft's controls; nothing in the present motion affects the scope of their testimony. The fact that Leffe is only one of three experts plaintiffs are offering to support their claim that mechanical failure caused the crash also distinguishes this case

16

from <u>Softel</u> where the precluded witness was the only expert
plaintiffs were offering.

     Assuming that the <u>Softel</u> factors are applicable not-
withstanding plaintiffs' multiple experts, application of those
factors does not demonstrate that precluding Leffe from testify-
ing to the substance of his April 15 Report is an inappropriate
remedy.

     First, plaintiffs offer no explanation for Leffe's
failure to conduct the testing described in his April 15 Report
before he served his opening report.  In addition, plaintiffs
identify no new matter in defendants' February 23 reports that
created a need for the testing underlying Leffe's April 15
Report.  Indeed, the extremely minimalist nature of Leffe's
opening report, the far broader nature of Leffe's April 15 Report
and the absence of any new issues in defendants' reports leads me
to conclude that plaintiffs' delay in producing the April 15
Report was tactical and a deliberate attempt to prevent an
appropriate response from defendants.

     The second <u>Softel</u> factor -- the importance of the
testimony of the precluded witness -- is questionable.  As noted
above, Leffe is not plaintiffs' only witness on the issue of
causation, and defendants' motion does not seek to entirely
preclude him from testifying.  Moreover, crediting Leffe's
deposition testimony that the cause of the crash could be deter-

mined from a visual inspection of the wreckage alone (Bradley
Aff. Ex. K at 119-23, 128-29, 185-86, 195), the incremental value
of testimony based on testing seems small.

      The third _Softel_ factor -- the prejudice suffered by
the opposing party as a result of having to prepare to meet the
new testimony -- is substantial.  Responding to Leffe's April 15
Report would require redeposing Leffe concerning the testing
first disclosed in his April 15 Report and may require defendants
to conduct their own testing.  In addition, defendants' experts
would be open to cross-examination concerning their failure to
perform any testing at an earlier point in time.

      The fourth _Softel_ factor requires the Court to deter-
mine whether a continuance would mitigate the possibility of
prejudice.  Although no trial date has yet been set in this
matter, I conclude that the utilizing a continuance here to
permit consideration of the April 15 Report is unwarranted.  The
contents of Leffe's April 15 Report clearly should have been
included in his opening report and plaintiffs offer no reasons
whatsoever why Leffe waited to perform testing to confirm his
conclusions.  Moreover, plaintiffs were warned during the course
of the December 19, 2008 conference call that I would consider a
third round of expert reports only if new matter were introduced
at the second round.  Plaintiffs' failure to include the data set
forth in Leffe's April 15 Report in Leffe's opening report is

indefensible.  Granting a continuance to permit plaintiffs'
behavior would serve no purpose except to encourage parties to
disregard the Court's scheduling order.

In summary, granting defendants' motion will not
prevent plaintiffs from presenting their case effectively and
denying the motion will prejudice defendants and result in
further delay.  The <u>Softel</u> factors do not, therefore, weigh in
favor of denying defendants' motion.

IV.  <u>Conclusion</u>

Accordingly, for all the foregoing reasons, defendants'
motion to strike the supplemental or rebuttal report of plain-
tiffs' expert, Peter Leffe, and to deny plaintiffs leave to serve
the report is granted.

Dated:  New York, New York
        December 18, 2009

                              SO ORDERED


                              _____
                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

Hunter J. Shkolnik, Esq.
Rheingold, Valet, Rheingold,
   Shkolnik & McCartney LLP
113 East 37th Street
New York, New York 10016-3042

Patrick E. Bradley, Esq.
Tara E. Nicola, Esq.
Reed Smith LLP
Princeton Forrestal Village
Suite 250
136 Main Street
Princeton, New Jersey 08540-7839